Okay, Ms. Borgbreen. Do I have permission to remove my mask? Yeah, you should take it off. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. There are a variety of issues that are subject of our briefing, but today I'd like to focus on the legal error with respect to the district court's construction of the portion claim terms and the 033 patent, as well as the error associated with the obvious misfinding. The district court construed the portion terms with an exclusion. It excludes an ibuprofen core with a famotidine outer shell. The district court's rationale was not based on any finding that there was a disclaimer or disavow anywhere in the intrinsic record. It was really based, if we look at the opinion at appendix page 74 to 79, on a finding that the invention was limited to a famotidine core that had a small surface area, that that was the invention. And that the disclosure in the patent specification and the examples of a bilayer was not part of the invention. Could the courtroom deputy maybe turn the volume up a little bit on the sound? Thank you. Go ahead. I'm sorry, Your Honor. Would you like me to try to speak louder? One or the other. Okay. All right. So we submit that this was legal error, because when you look at what the inventors describe in their patent, they clearly describe two embodiments, a famotidine core embodiment, where the surface area of the core is controlling stability. But they also clearly demonstrate in the examples another way that you can achieve the claimed stability limitation of less than 1% sulfamide, and that's through the use of a bilayer. So in that embodiment, the barrier layer that's being placed in the bilayer is what's giving rise to the stability. So the inventors had described these different embodiments, and they had a right to claim this broadly using broad portion terms that according to their plain and ordinary meaning, so as to encompass both of these embodiments. What you're saying, you said that you didn't think there was sufficient discussion in the prosecution history to amount to a disclaimer, but that doesn't mean that the discussion is irrelevant. In other words, the court could rely on those statements, even if it's not a complete disclaimer, to support the view that the specification otherwise only recites one particular form. Well, I think when you look at the prosecution of the claims that result in the 033 patent, what you see is initially the claims were limited to a famotidine core with the surface area defined according to the surface area core. You're going to have to speak up. I really can't hear you. I'm sorry, Your Honors. But then what the applicants did was to intentionally, they canceled that claim and intentionally pursued a broader claim scope where they used the term portion and included dependent claims which encompass these two embodiments, the bilayer tablet as well as the famotidine core. I think, Judge O'Malley, what you may be referring to is in later prosecution in the continuation patents, this, in our view, supports a broad construction of portion because in those cases, both the examiner and the applicant presumed that the scope of the invention and the scope of those claims, as originally written, encompassed an ibuprofen core embodiment. So they had to put into the claim an express proviso which carved it out from the scope of that claim. That doesn't operate as a disclaimer. That is more evidence that the term portion, as it's used in the 033 patent claims, must be construed according to its broad plain and ordinary meaning. And in this case, the party's experts agreed that there was a plain and ordinary meaning associated with the term portion. And the district court erred because the district court never made any findings concerning what was the plain and ordinary meaning of portion and instead focused exclusively on the specification in order to support the claim construction finding but also ignored the clear broadening amendment in the prosecution of the claims that resulted in the 033 patent which would have clearly put the public on notice that the inventors were intending portion to have its broad meaning. That's why there are dependent claims that go to these different embodiments. So we submit that there's absolutely nothing... But what in the written description would support an alternative embodiment? Well, if you look at the examples, in example three, and specifically in table three, there is disclosure of a multi-particulate which in column four, lines 37 to 42, the inventors clearly describe as an alternative embodiment that's outside the scope of the claims. But in the examples... Where did they do that? In column four, lines 37 to 42. And when you look at the examples, what you see is that that multi-particulate embodiment performed particularly badly because the target that they were shooting for was less than 1% sulfamide. The multi-particulate produced 3.55%. But each of the other embodiments, the bilayer and the tablet-in-tablet with the famotidine core, were able to achieve that low level of sulfamide. And there's nothing in the patent specification that indicates that the inventors did not consider the bilayer tablet to be part of the invention. There's a statement where they clearly say that the tablet-in-tablet with the famotidine core produced better results, and you can see that in the data. You're referring here to example three? You're suggesting example three is within the scope of the claim? Example three, and specifically the bilayer formulation that's described in example three, is within the scope of the claims. It seems to be comparing the present invention to table three, which is prior art, and saying the invention is superior. Well, the data for all of the embodiments is in table three, and the statement in the text of example three isn't comparing... it's not characterizing the bilayer as prior art. It says, surprisingly, a tablet-in-tablet formulation in accordance with the present invention exhibited remarkably improved stability, as shown by table three, as compared to... and then describing what was in the prior art, right? That's correct, Your Honor, but we submit that that statement isn't... it can't be read as a disclaimer of a bilayer tablet. The fact that they... You're talking about disclaimer. We're talking about interpreting claim terms in the light of the specification, which Philip says is appropriate. You don't just have... you don't look at the specification just to find disclaimers. You look at the specification to find definition of terms. So that's what we're talking about. Well, I think the specification is just one part of the intrinsic records. You have a plain and ordinary meaning, which is broad. You have a specification, which provides disclosure of a bilayer tablet. And then you have the prosecution history, where the applicants clearly were intending to cover that bilayer tablet as part of their invention. So if we are focused on what's the public notice, the public was clearly on notice when they made this broadening amendment and chose to use the term portion, that they were intending to... I'm sorry, I don't understand how, when you have the sentence that Judge Dyke just read to you, that you would claim that the present invention includes the bilayer formulation when it compares the present invention's success to both the multi-particulate and the bilayer formulation results. Well, Your Honor... How do you read that sentence? What it says is that it's a tablet-in-tablet in accordance with the invention. It doesn't say that it is the invention. It just says it's part of the invention. And it's touting the benefit of that impurity profile, which, if you look at the tablet-in-tablet with the barrier coding, the amount is zero. So that is a significant improvement over 0.91. But that isn't a statement that the bilayer is outside the scope of the invention. And when you look at the... Even in the abstract here, the invention is stated as the ibuprofen being the outer layer and the formidabide being the inner core. It makes sense. The compositions comprise the formidabide core having a reduced or minimal surface area surrounded by a layer of ibuprofen. I agree, Your Honor. But the abstract doesn't define that that is the sum total of the invention. It's just stating what is just... It's describing compositions that are disclosed in the specification. But in addition to a formodidine core, there's also disclosure of a bilayer tablet. And the claim limitation for the sulfamide is set at no more than 1%. And that clearly encompasses the 0.91 result that's obtained for the bilayer tablet. So we submit... When you look at the specification, and particularly in light of the plain and ordinary meaning... Is there anything in the actual claim language that calls out a bilayer formulation? If you look at the dependent claims, Your Honor, there are dependent claims in the issue claims. And these were part of what was presented in the broadening amendment. But if you look at claims 3, 4, and 8, those are all directed to a composition that has a portion that comprises a layer of famodidine beads. And if you look at claim 8, this is where it specifically focuses on this bilayer tablet where you have a barrier layer in between the two layers. So those are... Wait, which did you say focuses on a bilayer? Claims 3, 4, and 8. Where do... And 8 is the one that... Where do they use the word bilayer formulation? The term bilayer doesn't appear, but when you look at the description, it's describing two layers, a layer of famodidine and a layer of ibuprofen, which are separated by a barrier layer. But all of those relate back to the composition of claim 1. That's correct, Your Honor. And the composition of claim 1 just simply requires that all of the famodidine be in the second portion. The ibuprofen is in a first portion. And then these dependent claims, claim 8 requires that the famodidine portion be in a layer with a barrier layer, and then the ibuprofen portion is in a layer. So that's a bilayer tablet. So that's clear evidence to a person of ordinary skill in the arts that this term portion was intentionally used in its broad sense as sort of an umbrella term to encompass these different embodiments that are described in the specification. Could we turn to the obviousness issue? Yes, Your Honor. So with respect to obviousness, we believe that there's reversible error, there was legal error, because the district court found that the reason for allowance of these claims was the introduction of the sulfamide limitation, no more than 1% sulfamide. So this isn't a minor limitation, this is the basis for allowance. But the problem is that there is many evidence that the Golombic, who's a businessman, suggested that feature of this invention. In fact, he had no discussions about this invention. And the fact that he may have had a role in inventing that aspect of it in the prior art doesn't make him an inventor, correct? Well, so I think there are two issues in obviousness, and I'll answer your question and then move on to the other issue as well, because I just want to make sure they're understood separately. But with respect to Mr. Golombic, you're correct, he was a businessman. And at the time that this company was formed, there were two men, Dr. Tidmarsh and Mr. Golombic, who sat at a kitchen table and conceived of the subject matter in the 096 publication that Alchem relies on for obviousness. And it's the only place in the record where the district court found there was disclosure of 26.6. So coming to your question, so the district court found, with respect to the 096, that the two of them together conceived of that subject matter, and that that testimony was corroborated by numerous documents, which are FDA communications, including FDA meeting minutes coming back. They conceived of the ratio, and the question is whether Golombic suggested that ratio be used in this invention. And I don't see any evidence in this record other than perhaps his statements, perhaps even not his statements, suggesting that he contributed that aspect of this invention, as opposed to having invented that in the prior art. Well, so this is all part of, you know, this is the whole notion of joint inventorship. It's part of the same continuation of invention. And there's testimony in the record from Dr. Golombic. But Panu says that the fact that you invented something in the prior art, or even that you explained the prior art in connection with this invention is not enough. You have to have suggested the use of a feature from the prior art of this invention. Where do we have such evidence with respect to Golombic in this record? Well, Mr. Golombic was, he continued to be involved, and he testified that he was aware of the work that Tidmarsh was doing with Jerry Zhu, who developed the composition that he had meetings with them. Where did he suggest using this feature in the present invention? Well, the whole reason for the need to create this formulation was based on the fact that they had conceived of 800 milligrams, a huge amount of ibuprofen with a small amount of motor detail. But you're not answering my question. Where did he, where does this record show that he suggested the use of that ratio for the present invention? Because it's all part of the same, the same invention. Because it existed in the prior art, that's not enough. I'm sorry? Because it existed in the prior art, and he was responsible for it in the prior, that's not enough. But, Your Honor, the question of inventorship here is all to determine whether the 096 publication is even available as prior art. Because the only way it comes in is under 102A if it's by another. The point here is that it isn't by another. Sure, but you still have to have evidence showing that this guy was an inventor. And since he wasn't named on it, you have a pretty high burden, and it can't include just his testimony without corroboration. So what evidence specifically shows that he invented this? Well, the evidence is that he conceived of that amount, Mr. Tidmarsh. And then Tidmarsh continued to develop the product under the same group of people that were involved. Mr. Golombek didn't contribute to the stability result, but that's the wrong legal test. That's following the Levin test from the Fourth Circuit where you look at the patentable element. The question is, did he make some contribution to an element? So did anybody testify that he played a role in the invention of this patent? So, yes, because his involvement... Who? Tidmarsh and Golombek together... But Golombek's not good enough without independent corroboration. And it's corroborated by these FDA documents that show that they conceived of it, that they presented to the FDA in an IND application, and that was the genesis... Where did Golombek himself even testify that he contributed this feature to the present invention? Well, his testimony is that he contributed to the conception of the dose amounts, as in his testimony... That's not the same thing. He couldn't even identify what he contributed, right? He couldn't even identify it. He was asked whether he understood what... I mean, that's a legal conclusion. He is a layperson. He's a businessman. So you have to look at... Okay, so let's look at his testimony. Where does he say, I contributed this ratio from the prior art to this invention? So I just... I don't even see... Forget about corroboration. I don't even see where he testified. Because his contribution is the same invention that is described... I mean, section 102 permits inventors to describe their invention without penalties so long as they file the next application within one year. And it's improper under 102 to use his own prior invention against him together with Tim Marsh. So your answer is the evidence that shows he invented something in this invention is that other application. You don't have anything beyond that? It is the same... No, no, no. I understand your argument, but is that what you're pointing to? You don't have any independent evidence beyond that application to show that he invented something in this invention? Well, the evidence is his testimony... Can you just answer the question, is there anything more or not? Well, it is the same conception. There's not a difference between the first invention and the second. It's just a continuation. So I'll take that as a no. You have no additional evidence in the record to point to beyond that application? Well, I believe his testimony is that he contributed to the conception of that... Where? ...which resulted in the invention... The court found that testimony not to be credible because he didn't have any details, he couldn't remember anything, and you can say he's a businessman all he wants, but you also want him to be an inventor. But the... So the district court's credibility finding is not something that we would lightly disturb, is it? Well, the purpose of its credibility, or the purpose of corroboration is to verify that what this person is saying as a fact witness is true. And the documents do corroborate that, I mean, the court found that they had generated these documents together. They submitted them to the FDA. The FDA mini-minutes confirmed that that information was submitted and discussed and clarified at the meeting. So to the extent there's a question about credibility, the corroborating documents, which should be evaluated under a rule of reason analysis, under the circumstances where there are only two people involved in the conception at this point in time, the court found that this was all conducted before either Lee or Jerry Zhu later on were involved. I couldn't, before, unless Judge O'Malley or Judge Hughes have other questions about this, I just want to ask you one or two questions about the 451 because I find your argument baffling. I mean, yes, comprising allows you to bring in other things other than those specified in the claim, but as I understand it, the accused product here doesn't include at least some of the ingredients that are specified in the claims of the 451. So how, what's the point? So the big problem with the court's construction in the 451 patent is that it found this very broad disclaimer and essentially said, well, because you went to the patent office. Okay, but I'm asking you a specific question. Is it not the case that in the accused product, it does not have at least some of the ingredients that are in the 451 claim? So it is true that the accused product has differences from the specific ingredients that are... Well, and so, I mean, that seems to me fatal. I mean, you can have additional ingredients, but you've got to have at least the ingredients that are in the claim. Well, I think it becomes a question of equivalence, of infringement under the doctrine of equivalence, but because the court found a broad disclaimer of any and all other barrier layers or barrier layer ingredients, that disclaimer had the effect of precluding any potential argument for equivalence. And we think on the record, it was improper to find this broad disclaimer when all the applicants did was to go to the patent office and say, we want to focus on this barrier layer. And during prosecution, all they did was to say, our invention is this barrier layer, and the prior art doesn't teach or suggest it. There's never a place where they actually characterize the invention in a way that's any different than how it was recited in the claim. So for there to be a broad disclaimer finding, there needs to be some place where they actually characterize the OpaDry layer in a way that was different than how it was being claimed. Okay. I think we're out of time. We'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Rackesy, am I pronouncing that correctly? No. Rackosy. Rackosy. Okay. Thank you, ma'am. Please, the court, I'll address things  On the 451, that patent requires HPMC, polysorbate, PEG, and titanium dioxide. The outcome product doesn't contain a single component of the alkyl product. It doesn't contain a single one of the claimed ingredients. It does contain ingredients that were specifically disclaimed in prior art references. Polyvinyl alcohol, talc, a form of PEG, those were in that Ibanez reference and the Prole reference that were disclaimed. So it doesn't matter on the scope of the disclaimer here,  there was a clear textbook prosecution disclaimer when the claims are rejected over a reference that has the exact same barrier layer in the claim and ingredients that were disclaimed ingredients and Horizon tells or the applicant tells the office that we're distinguishable because there's one more ingredient in that barrier layer and it's not simply open dry white. They're telling the world that they are claiming only those ingredients and no others and they shouldn't be able to recapture that scope now. On the obviousness moving forward, they've got two problems on obviousness on this inventorship issue. The first one is to testify himself that he had no scientific development or formulation involvement whatsoever on the 033 patent invention or Duexis which is a commercial embodiment of the 033. That was his own testimony. When asked what he did contribute, he said he couldn't remember but he had discussions with Tidmarsh. As the court said, that's non-specific, that's not convincing, it's not credible and it's not corroborated. Not a single document of corroboration here and context and corroboration matters. You're talking about an interested witness still works for the company for $30,000 a month. For 13 years, he doesn't come forward. Two months of litigation, he doesn't come forward. On the eve of trial for the first time, now they're claiming he's an inventor because they want to knock out a piece of prior art. That makes corroboration key and there's not a single corroborating document, not a lab notebook, not an invention disclosure, not on the back of a napkin saying he contributed anything to the 033. Those fact findings, we believe, are not error, much less clear error. They were compelled by the record and because of that alone, the 096 is the work of another. But they don't challenge, secondly, Dr. Zhu. Complete silence on Dr. Zhu in their papers or their briefs to this court. The district court found Dr. Zhu had a significant contribution to the only thing that the 033 patent is about, which is a stable composition with that tablet architecture, the surface area and those stability limitations. The court found, as a matter of fact, that that was Zhu's contribution and they don't challenge those fact findings. So even regardless of Mr. Golombik, Zhu, again, makes different inventive entities and makes the 096 the work of another. So the 096 is in the case as prior art we submit under those fact findings either way and with the 096, they don't even press an obviousness argument regarding famotidine and its dosing. But even if we throw out the 096, they have problems because the district court, again, made a number of fact findings that they don't even challenge on appeal. The district court said the invention was obvious over Taha and or the 096, not both. And he then went on to make a series of specific findings that it was obvious to use the three times daily ibuprofen, 800 milligrams, that it was obvious to put them together, that Taha taught you you could successfully use famotidine twice daily at the same dose, 80 milligrams, in the claims. He went on to say that you could marry those intervals precisely because of the PK characteristics of famotidine. It was shown in the art to be used three times daily and to have linear PK. And FDA had already approved famotidine for once, twice, and four times daily. And beyond that, Horizon doesn't challenge any of the testimony or evidence in the district court from Dr. Barnett and Dr. Chambliss, both of whom the court credited. And Dr. Barnett specifically testified, Taha tells you you can use it twice a day at the claim dose and the other prior tells you you can use it at three times a day at the claim dose, such as the EDGE reference. So we submit there's no great leap here that it's obvious regardless of whether the 096 is in the case or not. Third, for reasons still not clear to me, they conceded in the district court and before this court that even if the 096 is not technically ART, they say it's still relevant to reasonable expectation of success. And that completely defeats their appeal here on obviousness because if it's relevant to reasonable expectation of success, meaning it informs the knowledge of the skilled person, then in addition to Taha and all those fact findings they don't challenge, showing there was motivation and reasonable expectation of success for famotidine meaning three times daily, then the skilled person would also know that someone had already suggested these actives together at those strengths three times daily. So obvious with or without the 096. On claim construction and infringement, this specification repeatedly and unequivocally describes the pharmaceutical compositions of the present invention or as it says, the claim feature of the invention as a dosage form with a famotidine compartment structured as a core and a ibuprofen compartment structured as a surrounding ibuprofen portion. We see that in the abstract. We see that in the summary of the invention. We see that in the detailed description where they talk about this supposed discovery that you can increase stability by reducing the surface area of contact. And it says the way you do that is you use the design of the present invention which they call the famotidine core. You manipulate that core with its geometry, its shape and size. You make it small. You get the surface area below formula 1 and that's the invention. That's all over the summary of the invention and the detailed description. There are no other embodiments in this patent. None. Every time they're talking about different aspects or different embodiments, they're talking about variations on that same famotidine core design. They're never talking about a different embodiment. So it's not a case of reading out embodiments or saying that a single embodiment means that's when it's the claims. There is only one invention here and that's the famotidine core design. Regarding this whole bilayer tablet issue, I think it's undisputed and the district court recognized this. It doesn't even show up in the intrinsic record at all until example 3. Up until example 3, every mention is about that famotidine core design and how if you use that and you control the geometry, you can then omit the barrier layer without sacrificing stability. What do you think the difference between Claim 5 and Claim 8 is than if everything in here is a core shell? Well, Your Honor, I think it's important. I think that's a great question. It's important to not use the term bilayer loosely because bilayer is used in this record in a couple of different ways. One way is you see in example 3 where you're basically taking imagine a sandwich, a layer of famotidine, a layer of ibuprofen, barrier layer, and you're sandwiching them together so you have a huge surface area obviously of the famotidine. So nothing like the invention. You're not using geometry to reduce that surface area. That's the bilayer tablet that they tested in example 3 and they found that the invention, the tablet with the famotidine core showed remarkable stability versus that bilayer. So that's the bilayer they're referring to in example 3 in which we believe the district court rightly said was not part of the invention. Bilayer is also used in other parts of the record such in the prior art. One of the publications that was used in the obviousness finding, the 876 publication, that uses bilayer terminology where you're taking an acid labile core. So imagine like famotidine or an acid labile active ingredient. You put it in a small core. You put a barrier layer around it and then you put one layer around it on the side. That's referred to as a bilayer configuration and there's a second one in the 876. It's figures 1 and 2 and Dr. Chan was testified about how those could also be referred to as bilayers and the district court said that was an obvious variation on the famotidine core invention here precisely because the 876 publication is still using that small... I'm sorry. I've let you go on but you're either too far in the weeds for me or you're not answering my question. Claim 5 specifically talks about the famotidine core, the ibuprofen layer, and the core is surrounded by a barrier, right? Claim 5, Your Honor? Yes. Claim 5 actually uses portion interchangeably with compartments. Compartments are defined terms to mean the famotidine core and the surrounding ibuprofen. Sorry. Let me just pull it up to make sure I'm not using the wrong words either. Sure. It's composition of claim 1 where the second portion's a core, the first portion's a shell, this surrounds it and there's a barrier layer. Right? That's kind of... That's what it says. So basically, instead of just having geometry, it also has a barrier layer to protect the core. Yeah, yeah. The barrier layer's optional. I guess what I'm asking is why, if everything here is about a core-shell composition, which is the claim construction essentially, I think, why is an 8 duplicative of 5? Because it has a second portion, a first portion, and the layers are surrounded by a barrier, if we're interpreting it all. No, Your Honor. I don't believe you are because portions is referring to the compartments, so that's the famotidine core. So can you tell me what Claim 8 looks like then? Claim 8 would still... Claim 8 would be what I was trying to refer to in the 876 publication. You would still have a core. Yeah. You would still have a famotidine core. That's the invention, the only thing described to the invention. And then you could have a layer of... You could have a barrier layer. Then you could have a layer of ibuprofen, which may or may not go all the way around it. So that's not referring to the bilayer comparator. I'll call it in the Example 3. How does the proposed, your end of product, your proposed product, how does it achieve stability? The Alkem product achieves stability via a barrier layer. So it, and this was the subject of Dr. Chambliss' testimony and the fact findings, Alkem has a huge, comparatively, ibuprofen core. It is, by mass quantity, it's 30 times larger than a famotidine core. And the record you can find in surface area, I believe it's 518 square millimeters of surface area of contact. And so it's huge. So it can't take advantage of the geometry. Even the inventor, Tidmarsh, testified that an ibuprofen core just won't work in the context of this invention. Formula 1 doesn't apply to it. And I believe he testified you can't use the geometry or surface area alone to stabilize it because it won't work. And he testified you have to stabilize it a different way. And so Alkem uses a barrier layer and they have to use a barrier layer to make it stable because of the incompatibility of these ingredients. That's what Dr. Chambliss testified. And this barrier layer is just not OPD-White, right? Correct. The Alkem barrier layer is polyvinyl alcohol talc. And I said it earlier and now it's escaping me. But it's three different ingredients. It's none of the ingredients in the 451 patent. It's actually the ingredients from one of those disclaimed or a couple of those disclaimed prior art references. But that's how it's stabilized. And that was one of the major grounds of the district court's DOE analysis when he actually delved into the two tests, the insubstantial differences and the function way result. He made that finding that the barrier layer was a substantially different way of stabilizing the product. And we submit that can't be error, much less clear error. But before we even get there, I think it's important to note the district court was correct to head off this DOE theory at the pass as insufficient as a matter of law because they admittedly, excuse me, Horizon admittedly applied it to more than one limitation at the same time in violation of the Warner-Jenkinson limitation by limitation. We don't necessarily even have to agree with that given that the court made alternative findings, right? Correct, Your Honor. We believe the alternative findings are not only, they're not clear error, but they are compelled by the evidence. But as an alternative, he found they didn't even apply a correct analysis by mishmashing the elements together. Their theory was if you separate it and it's stable, you infringe. There was no attempt to put linking argument or particularized testimony that an ibuprofen compartment that's not a core or that is a shell is somehow equivalent to a famotidine core. There's no attempt to do that. They assign the same function to everything. They said, you just take the portions, separate them, and stable product and you infringe. And we submit that was an improper DOE analysis. It doesn't go element by element. It looks at the product as a whole. But you are correct, Your Honor. The fact findings we believe stand. The district court's analysis was thorough, detailed, and we believe absolutely correct. So if there are any other questions, I will yield a few seconds I have left. Okay. Hearing none, thank you. Thank you, Your Honor. Your Honors, the Outcomes Council argues that Taha discloses a 26.6 milligram three times a day. The district court expressly found that it didn't at the APPX 155, that it was only the 096 publication that made that disclosure. And Outcomes Council also suggests that we don't challenge any of the district court's findings on obviousness aside from this question about the 096 publication being available as prior art. That's also not true. In our briefing, we also make the argument that this very limitation that resulted in allowance of the claims less than 1% sulfamide is a limitation that Outcome had the high burden of proof to establish by clear and convincing evidence that there was a reasonable expectation of success. Outcome presented no evidence at trial through its expert of anything to do with a reasonable expectation of success specifically with respect to sulfamide and specifically with respect to less than 1%. And so the district court's opinion, if you look at APPX 156 to 164, doesn't rely on any fact finding based on Outcome's testimony. What the district court did was to improperly shift the burden to Horizon and that whole section of the opinion is all about what Horizon failed to prove as opposed to what Outcome proved. So there's legal error because Outcome bore the burden of proof on that issue. It failed to provide any evidence. And then there's further error because the district court, in the absence of any evidence to support the expectation of success, then went and attempted to fill in the gaps with its own assessment of how a person of skill in the art would evaluate the prior art. And the court found that a person of skill in the art would have at least a bachelor's degree in chemistry or related field plus multiple years of experience. The district court is not a person of skill in the art. And both parties relied on experts to provide testimony about how a person of skill in the art would interpret these references. So there's further legal error because there's just no basis to find any reasonable expectation of success with respect to the key limitation that resulted in allowance of the patent. So we submit that that's a separate error from this question about whether the 096 patent is available as prior art. That error exists with or without the 096 publication. Also... I think we're out of time. Thank you. Thank you, Your Honor. I thank both counsel the case is submitted.